UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                        :
TUSHBABY, INC.,                                         :
                                                        :
                            Plaintiff,                  :
                                                        :                    24-CV-6150 (JMF)
              -v-                                       :
                                                        :                 OPINION AND ORDER
JINJANG KANGBERSI TRADE CO, LTD. et al.,                :
                                                        :
                            Defendants.                 :
                                                        :
---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    Plaintiff TushBaby, Inc. manufactures and distributes a baby carrier product.  On August

13, 2024, TushBaby filed a complaint alleging that certain defendants had infringed its trade

dress in violation of the Lanham Act and, the same day, moved for entry of a temporary

restraining order and preliminary injunction.  *See* ECF Nos. 1 ("Compl."), 6.  After obtaining a

temporary restraining order, *see* ECF No. 16, TushBaby amended its complaint to add two new

Defendants — Wenxi Wuyuan E-Commerce Co., Ltd. d/b/a BogiWell Direct ("BogiWell") and

Guangzhou City Woma International Trade Co., Ltd. d/b/a Cogesu US ("Cogesu" and, together

with BogiWell, "Appearing Defendants") — who appeared and opposed entry of a preliminary

injunction.  Following oral argument and supplemental briefing, the Court entered a bottom-line

order granting TushBaby's motion for a preliminary injunction for reasons to be explained in a

later opinion.  *See* ECF Nos. 66, 67.  This is the opinion.

## BACKGROUND

    As noted, TushBaby manufactures and distributes a baby carrier product.  Appearing

Defendants sell similar baby carrier products on Amazon under the "HKAI" brand.  *See* ECF No.

42 ("Defs.' Opp'n"), at 1.  TushBaby filed suit against them and others in a substantially similar

lawsuit filed earlier this year in the United States District Court for the Southern District of Florida. *See TushBaby, Inc. v. Corps., Ltd. Liab. Companies, & Unincorporated Ass'ns Identified on Schedule A*, No. 1:24-CV-21136 (S.D. Fla.). The Court in that case granted TushBaby a temporary restraining order, but on August 9, 2024, it denied TushBaby's request for a preliminary injunction on procedural grounds (namely, improper joinder). *See TushBaby, Inc. v. Corps., Ltd. Liab. Companies, & Unincorporated Ass'ns Identified on Schedule A*, No. 1:24-CV-21136, 2024 WL 3741359 (S.D. Fla. Aug. 9, 2024).

Four days later, TushBaby filed this case, naming as Defendants only Jinjang Kangbersi Trade Co, Ltd. and Lecia Grego Denisha LLC. *See* Compl. 1. The original complaint alleged that Jinjang Kangbersi Trade Co, Ltd. and Lecia Grego Denisha LLC infringed the TushBaby trade dress, which it described as "the overall design and configuration of the product," as shown in the following "copyright-protected photographs":

 

*Id.* ¶ 2. The original complaint further alleged that "[t]he defining characteristics of the TUSHBABY Carrier are the TUSHBABY Logo centered on a rounded front pouch, black wraparound straps, a variety of neutral colors for the outer shell material, and the configuration of side zipper and mesh pockets." *Id.* ¶ 20. On the day TushBaby filed its original complaint, it

also filed a motion seeking a temporary restraining order and preliminary injunction.  *See* ECF Nos. 6-7.  On September 4, 2024, after supplemental briefing on whether Defendants should be given notice of that motion, the Court granted a temporary restraining order and scheduled a show cause hearing for September 18, 2024.  *See* ECF No. 16.

Between the filing of the original complaint and the show cause hearing, there were several material developments.  First, on August 27, 2024, TushBaby successfully registered its trade dress with the United States Patent and Trademark Office ("USPTO").  *See* ECF No. 30-1 ("USPTO Registration").  The registration describes the TushBaby trade dress as "a three-dimensional [] configuration of a pocket and a flap" and depicts it as follows:





Reg. No. 7,489,071
Registered Aug. 27, 2024
Int. Cl.: 18
Trademark
Principal Register

TushBaby, Inc. (CALIFORNIA CORPORATION)
PO Box 413
160 Alamo Plz, CALIFORNIA 94507

CLASS 18: Pouch baby carriers; baby carriers worn on the body; baby carriers worn on the hip with storage for carrying babies' and parents' accessories

FIRST USE 5-8-2018; IN COMMERCE 5-8-2018

The mark consists of a three-dimensional the configuration of a pocket and a flap. The matter shown in dotted lines is not part of the claimed mark.

SEC.2(F)

SER. NO. 98-310,767, FILED 12-12-2023

*Id.* Second, TushBaby filed an Amended Complaint. *See* ECF No. 30 ("Am. Compl."). Most relevant for present purposes, the Amended Complaint added Appearing Defendants (thus mooting a motion that they had filed seeking to intervene) and a claim for infringement of the registered trade dress. *See id.* ¶¶ 26-27, 46. In light of these developments, the Court adjourned the show cause hearing, *see* ECF No. 35, which was ultimately held on October 2, 2024, ECF No. 56.[1] At the hearing, Appearing Defendants requested, and the Court granted, leave to file a supplemental brief, which they did on October 9, 2024. *See* ECF No. 60 ("Defs.' Supp. Mem."). On October 14, 2024, TushBaby filed a Second Amended Complaint on consent, adding Dalian Kaolitew Business Information Co., Ltd d/b/a CozyOne Shop ("CozyOne Shop") as a Defendant, *see* ECF No. 61, and the next day filed its own supplemental brief, *see* ECF No. 63.[2] On October 23, 2024, the Court entered an Order granting TushBaby's motion for a preliminary injunction "for reasons to be explained in a forthcoming Opinion." ECF No. 66, at 1.[3]

---

[1] In advance of the hearing, Appearing Defendants moved to strike certain filings that TushBaby had made in connection with its reply memorandum of law. *See* ECF No. 51. The Court denied that motion on the record during the show cause hearing, citing the fact that Appearing Defendants had effectively filed a surreply to address the filings and, thus, would not be unfairly prejudiced by their consideration. *See* ECF No. 55; *see also, e.g.*, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (holding that district courts have discretion to consider arguments made and evidence submitted for the first time in reply papers). The lack of prejudice is all the more apparent in light of the fact that, at their request, Appearing Defendants were permitted to file a supplemental memorandum of law following the hearing.

[2] Appearing Defendants filed a motion to dismiss the Second Amended Complaint on October 28, 2024. *See* ECF No. 72. That motion is not yet fully briefed.

[3] As discussed in that Order, the Court declined to extend the preliminary injunction to Defendant CozyOne Shop because CozyOne Shop had not had an opportunity to respond to the motion for a preliminary injunction. ECF No. 67. Instead, the Court extended the substantive terms of the Temporary Restraining Order and its effectiveness to CozyOne Shop pending CozyOne Shop's filing of any opposition to the motion for a preliminary injunction as to it. *Id.*

**DISCUSSION**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)) (internal quotation marks omitted).[4] In the trademark context, the Second Circuit has not always considered the balance of the hardships. *See, e.g.*, *City of New York by and through FDNY v. Henriquez*, 98 F.4th 402, 410 (2d Cir. 2024) ("To get a preliminary injunction in the trademark context, [a plaintiff] must show three things: (1) he will suffer irreparable harm; (2) he is likely to succeed on the merits; and (3) an injunction would serve the public interest." (citing *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022)). Out of an abundance of caution, and because the Second Circuit has sometimes considered the balance of hardships anyway, *see, e.g.*, *RiseandShine Corp.*, 41 F.4th at 125; *see also Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010) (identifying balance of hardships as a traditional equitable factor), the Court will consider all four of the factors here.

---

[4] Appearing Defendants argue that TushBaby must satisfy the heightened "clear or substantial likelihood of success on the merits" standard that applies to so-called "mandatory injunctions" because TushBaby's requested relief would disrupt the status quo. *See* Defs.' Supp. Mem. 4-5. That is wrong. The Second Circuit has expressly held that a preliminary injunction "in the typical trademark case" that "seeks to stop alleged infringement" is a prohibitory injunction — not a mandatory injunction — subject to the traditional likelihood of success on the merits standard. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006). That holding controls here.

**A.  Likelihood of Success on the Merits**

Beginning with the merits, the Court finds — based on the existing record — that TushBaby has established a likelihood of success on the merits of its Lanham Act claim for trade dress infringement.  To establish a valid Lanham Act claim based on trade dress infringement, a party must show (1) that the trade dress is valid and entitled to protection, and (2) that the defendant's use of the trade dress is likely to cause consumer confusion.  *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, 696 F.3d 206, 216-17 (2d Cir. 2012).  The Court will address each prong of the test in turn.

**1.  Trade Dress Validity**

To start, the Court finds that TushBaby has established that the TushBaby trade dress merits protection.  "In order for a trademark to be protectable, the mark must be distinctive and not generic."  *Id.* at 216 (internal quotation marks omitted).  Registration of a trade dress "entitles the owner to a presumption that its mark is valid" — i.e., distinctive.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).  But even if a trade dress is unregistered, a plaintiff can still establish its validity by showing that the trade dress is either itself "inherently distinctive" or has "acquired distinctiveness" through secondary meaning in the public eye.  *Id.* at 210-11.  "A mark has acquired 'secondary meaning' when, in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself."  *Christian Louboutin S.A.*, 696 F.3d at 216 (internal quotation marks omitted).

The TushBaby trade dress is valid for at least two reasons.  First, TushBaby holds a trade dress registration, which means the trade dress is presumptively valid.  *See* USPTO Registration.  Registering a trade dress with the USPTO "confers on the mark's holder certain benefits in litigation, including a rebuttable presumption that the mark is valid."  *Sulzer Mixpac AG v. A&N*

*Trading Co.*, 988 F.3d 174, 178 n.2 (2d Cir. 2021).  More specifically, the Lanham Act instructs that "[a]ny registration . . . of a mark . . . shall be prima facie evidence of the validity of the registered mark," 15 U.S.C. § 1115(a), and a "certificate of registration of a mark upon the principal register . . . shall be prima facie evidence of the validity of the registered mark," *id.* § 1057(b).  In other words, "when it obtained its registrations from the USPTO, [TushBaby] articulated the character and scope of its trade dress designs, and established the distinctiveness of the protected elements that comprised the trade dress designs.  By producing the certificates of registration, [TushBaby] has established that its trade dress marks are valid and protectable." *Nike, Inc. v. Reloaded Merch LLC*, No. 22-CV-10176 (VM), 2023 WL 8879274, at *4 (S.D.N.Y. Dec. 22, 2023).  As a result, TushBaby "is not required to separately plead the trade dress' character and scope or distinctiveness to state a claim for relief."  *Id.*

Appearing Defendants primarily object that TushBaby's registration does not support trade dress validity in this case because the registered trade dress is different from the unregistered trade dress alleged in TushBaby's motion for injunctive relief.  *See* ECF No. 54 ("Defs.' Reply"), at 1.  In particular, TushBaby's motion states that "[t]he TushBaby Trade Dress . . . consists of the overall design and configuration of the product featuring a distinctive rounded pouch with a logo centered on the front, black wraparound straps with various neutral colors for the outer shell material, and the configuration of the side zipper and mesh pockets."  ECF No. 7 ("Pl.'s Mem."), at 7.  The description of the *registered* trade dress, on the other hand, is limited to "a three-dimensional [] configuration of a pocket and a flap," USPTO Registration; it does not include the "distinctive rounded pouch" or the "logo centered on the front."  Given these differences, Appearing Defendants argue that "these are two different trade dresses."  Defs.' Reply 1.

This argument is unavailing. Assuming for the sake of argument that the trade dresses differ in description, it does not follow that the registered trade dress lends no support to the validity of the TushBaby trade dress as alleged. To the contrary, both trade dresses relate to the same product and overall design, and the alleged TushBaby trade dress includes all of the features protected by the registered trade dress. *See BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 521 (S.D.N.Y. 2019) (noting that a trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image"); *see also Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01-CV-11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003) (explaining that "[a] product's trade dress is not, in a legal sense, the combination of words which a party uses to describe or represent this 'total image,'" but rather "that image itself, however it may be represented in or by the written word"). In other words, the TushBaby trade dress encompasses the registered trade dress. Undeterred, Appearing Defendants assert that the "Registered Trade Dress is not even the subset of the Unregistered Trade Dress." Defs.' Supp. Mem. 2. But this assertion is plain wrong. TushBaby's trade dress registration refers to the product's center pocket and flap, which is indisputably part of the rounded pouch described and portrayed in TushBaby's original complaint and motion for injunctive relief. *See* Pl.'s Mem. 7. The Court thus finds that TushBaby's trade dress registration supports the presumptive validity of its trade dress.[5]

---

[5]    Appearing Defendants object further that they would be prejudiced by the Court's consideration of the trade dress registration. *See* Defs.' Supp. Mem. 4. This argument, however, is merely a veiled attempt to relitigate their failed motion to strike. In any event, any claim of prejudice is undermined by the fact that Appearing Defendants were permitted to file, and did file, a supplemental memorandum of law to address any issues related to the trade dress registration. *See* ECF No. 55. In short, Appearing Defendants had ample opportunity to be heard on issues related to the trade dress registration.

Second, and in any event, TushBaby has established that the alleged trade dress has acquired distinctiveness through secondary meaning. "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source." *Christian Louboutin S.A.*, 696 F.3d at 226. In determining secondary meaning, courts consider several factors including, "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997). "[N]o single factor is determinative, and every element need not be proved." *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (cleaned up).

In this case, the Court finds secondary meaning based on TushBaby's evidence of sales success, advertising expenditures, unsolicited media coverage showcasing its trade dress, and Appearing Defendants' imitation of the trade dress. The trade dress has developed secondary meaning, for instance, through its five years of use and $12 million in total marketing and advertising expenditures. *See* ECF No. 50 ("Rant Decl.") ¶¶ 9-19. During that time period, the TushBaby baby carrier has also enjoyed extensive media coverage — both solicited and unsolicited — and generated approximately $33 million in total revenue. *Id.*; *see also* ECF No. 50-2, at 4-5. And contrary to Appearing Defendants' assertion that TushBaby's marketing efforts have not sufficiently featured the TushBaby trade dress to develop secondary meaning, *see* Defs.' Supp. Mem. 5-6, TushBaby has presented ample evidence that the product's advertising and media coverage prominently bear and promote the carrier's unique design, *see* ECF No. 50-2, at 47-241. Finally, TushBaby's acquired distinctiveness is underscored by the existence of several imitations on the market, including Appearing Defendants' own. *See* Rant

Decl. ¶¶ 20-25; ECF Nos. 50-3, 50-4 (comparing the TushBaby baby carrier with imitation products). Such "intentional copying is persuasive evidence of secondary meaning." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 330 (S.D.N.Y. 2010).

Appearing Defendants' also object that TushBaby's trade dress is functional and thus not eligible for protection. *See* Defs.' Opp'n 9-17. Appearing Defendants' functionality defense, however, also falls short. "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982). "A design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." *LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985). In other words, "the absence of alternative constructions performing the same function . . . renders the feature functional." *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1148 (2d Cir. 1987). "[A] functional trade dress will not receive protection" because "[w]hen a court protects a trade symbol it precludes competitors from using the same symbol, and if that protection covers a functional feature, the first producer thereby obtains a potential monopoly placing other producers at a competitive disadvantage." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997). So, "[i]f [a trade dress] is functional, promotion of fair competition between producers demands that such trade dress be denied Lanham Act protection." *Id.*

Applying these principles, the Court is satisfied that the TushBaby trade dress is not functional. The gravamen of Appearing Defendants' functionality objection is that the most prominent features of the TushBaby carrier — the round center pouch, the wraparound straps, and the side pockets — are purely functional. *See* Defs.' Opp'n 10 ("[A]ll the claimed features

are functional."). Appearing Defendants' argument here fails, however, for at least two reasons. First, Appearing Defendants' focus on the functional nature of the individual components of the carrier misses the forest for the trees. Appearing Defendants' functionality argument walks through the utility of the TushBaby carrier's component parts piece by piece. *See id*. at 10-13 (discussing the functionality of, for instance, the TushBaby carrier's rounded pouch, utility pocket, and hip belt). But where, as here, "the asserted trade dress extends to the 'overall look' of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features taken together, not in isolation." *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 548 (S.D.N.Y. 2003). Thus, Appearing Defendants' claim that particular elements of the TushBaby carrier, standing alone, serve functional purposes does not defeat TushBaby's argument that the design's overall look is distinctive.

Second, Appearing Defendants' focus on the "usefulness" of these elements also misses the mark. As explained at the outset, the central question in the functionality inquiry is whether the design features in question are "essential to effective competition in [the] market," not whether the features are "useful." *Fun-Damental Too, Ltd.*, 111 F.3d at 1002; *see also Fabrication Enterprises, Inc. v. Hygienic Corp.*, 64 F.3d 53, 59 (2d Cir. 1995) (noting that "a useful product feature may serve both source-identifying and utilitarian ends"). Appearing Defendants' argument, however, conflates the ordinary meaning of the term "functional" with the legal meaning of the term in the trade dress context. The TushBaby carrier's pocket features are obviously useful, providing users with storage space for various items and accessories. But that does not mean that these design features, viewed in the aggregate, are essential to effective competition in the baby carrier market. Indeed, as TushBaby rightly observes, the

nonfunctionality of its trade dress as a whole is "demonstrated by the numerous other designs in the market." ECF No. 47 ("Pl.'s Reply"), at 4; *see* ECF No. 50-2, at 8-38, 78-82 (providing examples of different designs in the baby carrier market). Thus, the TushBaby trade dress is nonfunctional, protectable, and valid.

### 2. Consumer Confusion

As noted, TushBaby must also show a likelihood of consumer confusion. Here too, TushBaby has the better argument. In evaluating whether a party has established consumer confusion, courts in this Circuit consider the eight factors originally set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961): "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (internal quotation marks omitted). The Second Circuit has further instructed that "[t]he application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.* (internal quotation marks omitted).

Beginning with the first factor — the strength of TushBaby's trade dress — the Court concludes that the TushBaby trade dress is conceptually and commercially strong. "[T]he strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004) (internal quotation marks omitted). In assessing strength, courts also consider "both the mark's

inherent distinctiveness, based on the characteristics of the mark itself, and its acquired

distinctiveness, based on associations the mark has gained through use in commerce." *Akiro*

*LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013).  Here, the strength

of the TushBaby trade dress weighs heavily in TushBaby's favor substantially for the reasons

discussed above in connection with the question of whether the TushBaby Trade Dress is entitled

to protection.  As the Court concluded, TushBaby has established the distinctiveness of its trade

dress through acquired secondary meaning and its trade dress registration.

　　　　The second *Polaroid* factor — the similarity of the marks — also strongly favors

TushBaby.  "Similarity is a holistic consideration that turns on the marks' sight, sound, and

overall commercial impression under the totality of the circumstances."  *Coty Inc. v. Excell*

*Brands, LLC*, 277 F. Supp. 3d 425, 446 (S.D.N.Y. 2017).  In this instance, "[Appearing]

Defendants' product utilizes trade dress which is practically identical" to the TushBaby trade

dress.  Pl.'s Reply 6; *see also* ECF Nos. 50-3, 50-4 (comparing the two products).  Indeed, as the

following depiction makes plain, Appearing Defendants' product has all the same features that

comprise the TushBaby carrier, namely the rounded front pouch, the black wraparound straps, an

outer shell in a variety of neutral colors, and adjoined mesh pockets with side zippers:



*See* Pl.'s Mem. 10-11.  Grasping at straws, Appearing Defendants point out that their products display different brand logos.  *See* Defs.' Opp'n 18; Defs.' Supp. Mem. 8.  But the different logos are not enough to distinguish the products in the minds of consumers, as "labels alone cannot insulate an infringer."  *Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 128 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000).

The third and fourth *Polaroid* factors — competitive proximity and bridging the gap — are not disputed and further support a finding of a likelihood of confusion.  *See* Defs.' Opp'n 21 (conceding that parties' products "are designed for the same market").  The products are nearly identical and compete in the same market for baby carriers.  *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988) ("Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity.").  Indeed, Appearing Defendants even note that the products sit side-by-side on "the Amazon best sellers ranking system" for "Baby and Toddler Carriers."  Defs.' Opp'n 8; *see* ECF No. 42-2 at 2.  Accordingly, these factors favor TushBaby as well.

The fifth factor is actual consumer confusion.  Evidence of actual confusion "is not dispositive of the question of likelihood of confusion."  *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995).  Nevertheless, "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).  For that reason, the Second Circuit has said that such evidence is "particularly relevant" to the inquiry at hand.  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998).

TushBaby's argument here is based on two types of consumer confusion: initial-interest confusion and post-sale confusion.  *See* Pl.'s Reply 6-7.  Initial-interest confusion occurs when

"potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 514-15 (S.D.N.Y. 1993); *accord Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987). Post-sale confusion, on the other hand, occurs — as the term suggests — after a sale is completed, and it may be present "when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir. 2000).

      Here, the Court finds that the actual consumer confusion factor slightly favors TushBaby. To prove that consumers are attracted to Appearing Defendants' products by virtue of their resemblance to the TushBaby product (i.e., initial-interest confusion), TushBaby collects several buyer reviews and social media posts describing Appearing Defendants' carrier as a "knock off" or "dupe" TushBaby carrier. *See* ECF No. 50-4, at 2-3. These testimonials may not be as probative as well-designed consumer surveys, but parties may rely on anecdotal evidence that shows "a probability of confusion . . . affecting numerous ordinary prudent purchasers." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 523 (S.D.N.Y. 2008) (internal quotation marks omitted). And although TushBaby's evidence of actual consumer confusion is far from overwhelming, it plausibly suggests that consumers gravitate toward Appearing Defendants' products precisely because they imitate TushBaby's trade dress. *Cf. Fun-Damental Too, Ltd.*, 111 F.3d at 1004 (finding that testimony from a single employee regarding actual confusion was "sufficient to support a finding of actual confusion at the preliminary injunction stage"). Without competing evidence of their own, Appearing

Defendants respond that these buyer reviews show that "there is no actual confusion" because "[a]ll the consumers are clearly aware [that] the Accused Products are not sourced from Plaintiff." Defs.' Supp. Mem. 8-9. But this response misses the mark because it confuses initial-interest confusion with point-of-sale or post-sale confusion. In short, because TushBaby presents anecdotal evidence of actual initial-interest confusion, the Court finds that the fifth *Polaroid* factor weighs slightly in TushBaby's favor.

The sixth *Polaroid* factor is bad faith, which concerns "whether the defendant adopted its marks with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991). In this case, the record is replete with evidence of bad faith. Undaunted, Appearing Defendants insist that the different brand label affixed to their product demonstrates good faith. *See* Defs.' Supp. Mem. 9. If anything, however, slapping a different logo on an otherwise identical product evinces bad faith on Appearing Defendants' part. Even more brazenly, Appearing Defendants assert that they had "no knowledge of Plaintiff before being sued by Plaintiff." Defs.' Opp'n 20. But this claim beggars belief. For one thing, as discussed, Appearing Defendants' products bear uncanny resemblance to the TushBaby trade dress. *See Coty Inc.*, 277 F. Supp. 3d at 455 ("The company's intent to deceive can be inferred from the remarkable similarities between the . . . trade dresses[.]"). For another, Appearing Defendants promote their products with substantially similar marketing materials and imagery. *See* Rant Decl. ¶ 21; ECF No. 50-3 (comparing product marketing materials employing substantially similar diagrams, visuals, and language). Indeed, Appearing Defendants even marketed their baby carrier as a "Moms Choice Award" winner — an award that *TushBaby* received in 2022. *See* Rant Decl. ¶ 13; ECF No. 8-1, at 26. Lastly, Appearing Defendants themselves acknowledge

that the two products sit side-by-side on Amazon's listings for "Baby and Toddler Carriers." Defs.' Opp'n 8.  All of this is inconsistent with Appearing Defendants' claim that they lacked any knowledge whatsoever about the existence of TushBaby's product.  In short, the sixth *Polaroid* factor weighs heavily in TushBaby's favor.

Lastly, the Court finds that the final two *Polaroid* factors — quality of the products and sophistication of consumers — favor neither party.  The seventh *Polaroid* factor calls for an examination of the respective quality of the products at issue.  "Under this factor a court first examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 142 (2d Cir. 1999).  The record at this stage sheds little light on this question.  Appearing Defendants point out that the dueling products have virtually identical buyer ratings on Amazon, suggesting comparable product quality.  *See* Defs.' Opp'n 20.  TushBaby counters that many buyer reviews expressly describe Appearing Defendants' product as a cheaper and lower quality — albeit usable — knock-off of the TushBaby product. *See* Pl.'s Reply 8-9.  Without more, the Court concludes that the seventh factor is in equipoise and favors neither side.

So too with respect to the eighth *Polaroid* factor, the "sophistication of the consumers and the degree of care likely to [be] exercised in purchasing the product." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 420 (S.D.N.Y. 2002).  Under this factor, courts are to consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 965 (2d Cir. 1996).  Neither party devotes much attention to this factor.  They seem to agree that

parents are likely to exercise care in purchasing products for their infants.  *See* Defs.' Opp'n 20.
At the same time, where, as here, parties' products are substantially similar, "the sophistication
of buyers is less likely to prevent confusion."  *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.
Supp. 547, 556 (S.D.N.Y. 1996).  The Court thus finds that this factor is also in equipoise and
favors neither side.

Considering all eight *Polaroid* factors and "looking at the products in their totality," the
Court concludes that consumers are likely to be confused by Appearing Defendants' knockoff
TushBaby products.  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005).
To be sure, "the *Polaroid* inquiry is not a mere mechanical counting exercise."  *Coty Inc.*, 277 F.
Supp. 3d at 456 (internal quotation marks omitted).  But at this stage, six of the eight factors
weigh in TushBaby's favor, while none of the factors favor Appearing Defendants.  The Court
thus finds that TushBaby has met its burden at this stage to show that consumers are likely to be
confused and that TushBaby is likely to succeed on the merits of their infringement claim.

## B.  Irreparable Harm

Next, the Court finds that TushBaby has also established irreparable harm.  Irreparable
harm is "harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a
final adjudication, whether by damages or a permanent injunction."  *Salinger*, 607 F.3d at 81.
"Courts have consistently found irreparable harm to exist in situations where there is a likelihood
of confusion between the marks, and where the reputation and goodwill cultivated by the party
seeking the injunction would be out of the party's control because of the infringement."
*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1092 (JMF), 2015 WL
845711, at *7 (S.D.N.Y. Feb. 26, 2015) (internal quotation marks omitted); *see also Jeffrey
Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995) ("In the trade dress

context, a showing of likelihood of confusion as to source will establish a risk of irreparable

harm."). And for good reason. Where a party seeking injunctive relief "shows that it will lose

control over the reputation of its trademark . . . loss of control over one's reputation is neither

calculable nor precisely compensable." *NYP Holdings v. N.Y. Post Pub'g Inc.*, 63 F. Supp. 3d

328, 341 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Really Good Stuff, LLC v.*

*BAP Investors, L.C.*, 813 Fed. App'x 39, 44 (2d Cir. 2020) (summary order) ("The loss of

reputation and goodwill constitutes irreparable harm.").

      That is the case here. As discussed, TushBaby has invested substantial resources into

making its baby carrier commercially successful and well known. TushBaby has amassed

substantial goodwill and a favorable reputation during its five years of operation. And,

marshalling evidence of its product's distinctiveness, TushBaby obtained a trade dress

registration. The Court accordingly concludes that, by misappropriating TushBaby's trade dress,

Appearing Defendants are not only trading on TushBaby's earned goodwill but are also

depriving TushBaby of control over its reputation and the products offered under its name.

      Once again, Appearing Defendants' responses are unavailing. Appearing Defendants

object first that TushBaby's delay in filing suit undermines its claim of irreparable harm. *See*

Defs.' Opp'n 22. Specifically, they point to the five months that elapsed between when

TushBaby filed suit against Appearing Defendants in the Southern District of Florida and when

TushBaby filed the instant suit. *See id.* To be sure, courts "must consider a plaintiff's delay in

seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of

relief." *Ingber v. N.Y.C. Dep't of Educ.*, No. 14-CV-3942 (JMF), 2014 WL 2575780, at *2

(S.D.N.Y. June 9, 2014). After all, "[s]ignificant delay in applying for injunctive relief tends to

discredit "the theory that there is an urgent need for speedy action to protect the plaintiffs'

rights." *Citibank N.A. v. Cititrust*, 756 F.2d 273, 276 (2d Cir. 1985). But no such delay exists here. The Florida Court denied TushBaby's request for injunctive relief on procedural grounds in August 2024. *See* ECF No. 48 ¶ 9. Only four days later, TushBaby filed the instant action, simultaneously seeking a temporary restraining order and an order to show cause for preliminary injunction. *See* ECF Nos. 1, 6, 7. That is not delay, let alone delay that undermines TushBaby's claim.

Nor is the Court persuaded by Appearing Defendants' assertion that TushBaby's claimed injuries are too vague to constitute irreparable harm. *See* Defs.' Opp'n 23. As even Appearing Defendants admit, "[c]ourts have repeatedly held that damages to a business's goodwill as a result of unauthorized trademark usage are not readily quantifiable and, thus, constitute irreparable harm." *Id.*; *see, e.g., NYP Holdings*, 63 F. Supp. 3d at 341; *Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F. Supp. 2d 211, 226-27 (W.D.N.Y. 2012). And, as previously discussed, TushBaby has established a likelihood of damage to its reputation and goodwill that will persist absent injunctive relief. TushBaby has thus established irreparable harm.

## C. The Public Interest and Balance of Hardships

Finally, the Court concludes that TushBaby has established that the equitable injunction factors tip in its favor. As to the public interest, "[t]he consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011); *see also Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (finding that the public interest is served "by removing confusing trade dress from the marketplace"). And as to the balance of hardships, Appearing Defendants argue that TushBaby will not suffer any harm absent a preliminary injunction because TushBaby has established neither validity of the trade dress nor a likelihood

of confusion.  Defs.' Opp'n 23.  But as explained above, the potential loss of goodwill and

reputation that TushBaby will face absent injunctive relief constitutes irreparable harm.  And

although a preliminary injunction is likely to carry economic costs for Appearing Defendants,

such harms are largely self-inflicted given that "[Appearing] Defendants took a calculated risk in

launching a product with a trade dress virtually identical to the trade dress" associated with

TushBaby.  *Barefoot Contessa Pantry, LLC*, 2015 WL 845711, at *8.

Putting the pieces together, the Court concludes that each of the traditional preliminary

injunction factors weighs in favor of entering the requested injunctive relief in this case.

### D.  Expedited Discovery and Evidentiary Hearing

One final note.  In conjunction with their opposition to TushBaby's motion for a

preliminary injunction, Appearing Defendants request expedited discovery and an evidentiary

hearing.  *See* Defs.' Supp. Mem. 9-10.  These requests are denied.  Starting with the request for

expedited discovery, courts in the Second Circuit apply two tests to determine whether expedited

discovery is appropriate.  *See Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y.

2011).  The first is a flexible "reasonableness" and "good cause" standard.  *See Stern v. Cosby*,

246 F.R.D. 453, 457 (S.D.N.Y. 2007).  The second is the four-factor test articulated in *Notaro v.

Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), which requires the party seeking expedited discovery to

demonstrate "(1) irreparable injury; (2) some probability of success on the merits; (3) some

connection between the expedited discovery and the avoidance of the irreparable injury, and (4)

some evidence that the injury that will result without expedited discovery looms greater than the

injury that the defendant will suffer if the expedited relief is granted," *id.* at 405.

Appearing Defendants' request for expedited discovery satisfies neither standard.  At the

October 2, 2024 preliminary injunction hearing, the Court asked Appearing Defendants' counsel

on the record whether expedited discovery or an evidentiary hearing were necessary to resolve the motion. *See* ECF No. 56, at 6. Appearing Defendants' counsel answered in the negative. *Id.* At the conclusion of the hearing — perhaps sensing which way the wind was blowing — counsel changed tack and claimed that expedited discovery and an evidentiary hearing would be appropriate to address TushBaby's trade dress registration. *Id.* at 22. Appearing Defendants' supplemental memorandum, however, makes no effort to explain why expedited discovery or an evidentiary hearing are necessary to resolve questions related to the trade dress registration. Nor does it identify any irreparable harm they would suffer in the absence of expedited discovery. Instead, Appearing Defendants assert broadly that discovery and an evidentiary hearing would aid the Court's determinations as to secondary meaning and functionality, without identifying any discrete factual issues that would benefit from expedited fact finding at this stage. *See* Defs.' Supp. Mem. At 9-10. What is more, for the reasons discussed earlier, Appearing Defendants have not shown a probability of success on the merits. The Court thus finds that expedited discovery in connection with the present motion is unwarranted.

Nor have Appearing Defendants offered any concrete basis to justify an evidentiary hearing. The Court permitted Appearing Defendants to submit multiple supplemental filings to oppose the preliminary injunction request, including a reply in support of the motion to strike that amounts to a surreply and a supplemental memorandum of law. Defs.' Reply; Defs.' Supp. Mem.; *see also Drywall Tapers & Pointers of Greater N.Y., Loc. 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 537 F.2d 669, 674 (2d Cir. 1976) (noting that "[t]he obvious purpose of the hearing requirements is to . . . ensure that relief follows only after consideration of all facts and arguments deemed important by the parties"). Now, at the eleventh hour, Appearing Defendants request an evidentiary hearing based on "multiple facts disputes" related to

TushBaby's trade dress infringement claim, without identifying any specific and essential factual disputes warranting an evidentiary hearing.  Defs.' Supp. Mem. 10.  And, in any event, the Court is satisfied that the parties' disputes over the trade dress infringement claim can be resolved based on the paper record alone.  *See Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 512 (2d Cir. 2005) ("[A]n evidentiary hearing is not required when, *inter alia*, disputed facts are amenable to complete resolution on a paper record."); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (same).  Accordingly, Appearing Defendants' request for an evidentiary hearing is denied as well.

## CONCLUSION

For the foregoing reasons, the Court GRANTED TushBaby's request for a preliminary injunction, the scope of which was delineated in the Order entered on October 23, 2024.  *See* ECF No. 66.  The Court, pursuant to 15 U.S.C. § 1116(d)(5)(D) and Federal Rule of Civil Procedure 65(c), also ordered that TushBaby deposit $100,000 with the Court as security, having determined that amount to be adequate for the payment of damages in the event of wrongful restraint.  *Id*. at 2.

SO ORDERED.

Dated: October 30, 2024
       New York, New York

_____
JESSE M. FURMAN
United States District Judge